UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FLOYD DAVIS, JR.                                    CIVIL ACTION

VERSUS                                              NUMBER: 15-4414

SHERIFF JERRY LARPENTER, <u>ET</u> <u>AL</u>.              SECTION: "R"(5)

### <u>REPORT AND RECOMMENDATION</u>

This 42 U.S.C. §1983 proceeding was filed *in forma pauperis* ("IFP") by *pro se* Plaintiff, Floyd Davis, Jr., against Defendants, Terrebonne Parish Sheriff Jerry Larpenter, Warden Claude Triche of the Terrebonne Parish Criminal Justice Complex ("TPCJC"), and Terrebonne Parish President Michelle Claudet.  (Rec. doc. 1, pp. 1, 4).

Plaintiff is an inmate of the Lafourche Parish Detention Center ("LPDC") who was previously incarcerated at TPCJC.  Plaintiff states that upon his entry into TPCJC on June 30, 2015, he was assigned to a floor bunk on the second level upstairs floor of the jail "… out of the way of harm …" because the jail is overcrowded, a condition that makes it difficult for him to rest at his age of 50.  Plaintiff alleges that on the morning of July 20, 2015, he heard "pill call" being announced and in the process of trying to get up to get his medication, because he was too close to the edge which has insufficient railings in any event, his hand slipped off the bar, causing him to fall 15 feet and to land upon a table that was situated below.  Following the incident, Plaintiff indicates that he was attended to by EMTs, was placed on a gurney, and was transported to the Leonard J. Chabert Medical Center ("LCMC") where an MRI was performed which revealed three ruptured discs.  Plaintiff states that he was given medication and a neck brace following the evaluation and was returned to TPCJC

in a "fully medicated" state.  Since that time, Plaintiff indicates that he has not been seen by a bone specialist as was recommended by attending medical personnel at LCMC nor has he been reassigned to a medical dorm purportedly as a result of discrimination.  In his prayer for relief, Plaintiff seeks an unspecified amount of compensatory damages and to be seen by a neurologist or a bone specialist.  (Rec. doc. 1, pp. 5, 7-9).

Plaintiff has instituted this suit IFP pursuant to 28 U.S.C. §1915.  A proceeding brought IFP may be dismissed as frivolous under §1915(e)(2)(B)(i) if the claim alleged therein has no arguable basis in law or fact, *Booker v. Koonce*, 2 F.3d 114 (5th Cir. 1993), or if it fails to state a claim upon which relief can be granted.  28 U.S.C. §1915(e)(2)(B)(ii); *see also* 28 U.S.C. §1915A(b), 42 U.S.C. §1997e(c).  Giving the instant complaint a liberal reading, it is the recommendation of the undersigned Magistrate Judge that this matter be dismissed as frivolous and for failing to state a claim upon which relief can be granted.

Plaintiff gives no indication in his complaint of the capacity in which the named Defendants are being sued.  "When a pro se plaintiff does not specify in his complaint whether a defendant is named in his or her official or individual capacity, it is generally presumed by operation of law that the defendant is named in his or her official capacity." *Douglas v. Gusman*, 567 F.Supp. 2d 877, 888-89 (E.D. La. 2008).  "'In a suit brought against a municipal official in his [or her] official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury.'"  *Carter v. Strain*, No. 09-CV-0015, 2009 WL 3231826 at *2 (E.D. La. Oct. 1, 2009)(quoting *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007), *cert. denied*, 555 U.S. 813, 129 S.Ct. 42 (2008)).  "'A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity.'"  *Id.* (quoting *Colle v. Brazos County, Texas*, 982 F.2d 237, 245 (5th Cir. 1993)).  Rather, the plaintiff

"… must <u>identify</u> the policy or custom which allegedly caused the deprivation of his constitutional rights." *Id.* (citing *Murray v. Town of Mansura*, 76 Fed.Appx. 547, 549 (5th Cir. 2003) and *Treece v. Louisiana*, 74 Fed.Appx. 315, 316 (5th Cir. 2003)).

Measured against the foregoing standards, Plaintiff's allegations against the named Defendants in their official capacity fail to state a claim upon which relief can be granted as he does not allege that the purported deprivation resulted from a policy or custom, much less identify any such policy or custom. *Carter*, 2009 WL 3231826 at *2. Viewing Plaintiff's allegations as being made against the named Defendants in their individual capacity, he fares no better because "[p]laintiffs suing governmental officials in their individual capacities . . . must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to the constitutional claims." *Id.* at *1 (quoting *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)). This is so because "'[p]ersonal involvement is an essential element of a civil rights cause of action.'" *Id.* (quoting *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983)). Supervisory officials like the Sheriff and the Warden ". . . cannot be held liable for federal civil rights violations allegedly committed by [their] associates based merely on a theory of strict liability or vicarious liability." *Id.* (footnotes omitted). *Respondeat superior* is not a concept that is applicable to proceedings brought under §1983. *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), *cert. denied*, 471 U.S. 1126, 105 S.Ct. 2659 (1985); *Lozano v. Smith*, 719 F.2d 756, 768, (5th Cir. 1983); *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981).

Other than identifying the Sheriff, Warden, and Parish President as the Defendants in the caption of and again on page four of his complaint, Plaintiff's principal pleading contains no allegations whatsoever regarding their involvement in the matters of which he complains

herein.  Plaintiff does attach to his complaint a number of inmate grievance forms, inmate request forms, and request for medical attention forms that he completed while housed at TPCJC, some of which tangentially mention the named Defendants.   Those forms are summarized below.

On July 21, 2015, the day following the incident in question, Plaintiff completed an inmate grievance form in which he complained that the Ibuprofen that had been prescribed at LCMC had not been effective in relieving his pain.  (Rec. doc. 1, p. 24).  Although the copy of the form that Plaintiff attached to his complaint is difficult to read, the grievance was promptly responded to the following day by a prison official who appears to have indicated that Plaintiff was receiving the very treatment that had been ordered at the hospital.  (*Id.*).  On July 24, 2015, Plaintiff completed a second inmate grievance form, providing that date as the date of the incident that was the subject of the grievance.  (*Id.* at p. 10).  There, Plaintiff again complained that Ibuprofen was not effective and that he was in need of stronger pain medication and to see a doctor again.  (*Id.*).  Plaintiff's second grievance was formally responded to by a TPCJC official on July 28, 2015 who indicated that Plaintiff had been seen by Dr. Haydel on that date.  (*Id.*).  In the meantime, on July 26, 2015, Plaintiff had completed two separate forms requesting medical attention, complaining of pain and discomfort in his neck and shoulder area as well as numbness to the arms and hands for which further doctor treatment was sought.  (Rec. doc. 1, pp. 21, 22).  In one of those request forms, Plaintiff suggested that a specialist could more easily diagnose his condition.  (*Id.* at p. 21).

On August 3, 2015, Plaintiff completed another inmate grievance form, providing July 20, 2015 as the date of the subject incident and identifying Dr. Neal, Warden Triche, and the entire D-100 cell block in a section of the form asking for "NAME OF STAFF INVOLVED." (Rec.

doc. 1, p. 11).  In this form, Plaintiff simply inquired as to whether he was required to pay for his medication.  (*Id.*).  On August 4, 2015, Floyd was advised that "[a]ccording to jail policy inmates pay for their medication."  (*Id.*).  In the interim, Floyd had, on August 3, 2015, completed an inmate request form that was directed to Dr. Neal or the Warden in which he again complained of the effectiveness of Ibuprofen and requested to be seen by a bone specialist or a neurosurgeon.  (*Id.* at p. 25)  Like Plaintiff's third grievance, this request was responded to on August 4, 2015, reminding Floyd that on the day of the incident in question, he had been taken to the hospital where a CAT scan of his cervical spine, thorax, neck, and pelvis had been performed and the attending physician had rendered a diagnosis of degenerative disease and strain to the neck.  (*Id.*).

On August 7, 2015, Plaintiff completed his fourth inmate grievance form, identifying Dr. Neal, Warden Triche, "and all of [the] medical staff" as those involved in the incident of which he complained, namely, continued pain and discomfort in the neck and shoulder area and numbness in the arms and hands coupled with a renewed request to see a neurologist and a bone specialist.  (Rec. doc. 1, p. 26).  The response to Plaintiff dated August 11, 2015 again reminded him of the diagnostic testing that had previously been performed at LCMC and the resulting diagnosis of degenerative disease of the cervical spine with cervical strain.  (*Id.*).  Plaintiff was referred back to the doctor for further evaluation.  (*Id.*).  On the same date as that response, Plaintiff had completed his fifth grievance form, again requesting stronger pain medication and to see Dr. Haydel on his next visit to TPCJC.  (Rec. doc. 1, p. 17).

Plaintiff completed his second inmate request form on August 15, 2015, addressing it to Warden Triche and Sheriff Larpenter and identifying the areas of concern as "jail" and "medical problems."  (Rec. doc. 1, p. 16).  There, Plaintiff explained that he was in pain after

exhausting his supply of medication but had been told by unidentified medical staff that he could not see the physician at TPCJC. (*Id.*). In a post-script, Floyd conveyed his belief that his civil rights were being violated and that he had a right to see a doctor when he was in pain. (*Id.*). No response appears on the copy of the inmate request form that Plaintiff attached to his complaint. (*Id.*). The following day, August 16, 2015, Plaintiff completed a "REQUEST FOR MEDICAL ATTENTION FORM," reiterating his desire to see the TPCJC physician and a physical therapist, bone specialist, or neurosurgeon. (Rec. doc. 1, p. 20). Also attached to Plaintiff's complaint are two handwritten grievance forms dated August 17, 2015 that are substantially similar but not identical. (*Id.* at pp. 19, 23). Identified as the staff involved in the incident that was the subject of that grievance were Dr. Neal, the TPCJC medical staff, Warden Triche, Sheriff Larpenter, and Parish President Claudet. (*Id.*). There, Plaintiff indicated that he had no more medication and that he had been told by unidentified staff that he could not see a doctor, leading him to conclude that his civil rights were being violated. (*Id.*). No responses to those duplicate grievance forms appear on the copies that Plaintiff provided to the court. (*Id.*).

Yet another grievance form regarding the incident of July 20, 2015 was completed by Davis on August 18, 2015, with the same staff as his previous grievance being identified as involved. (Rec. doc. 1, p. 18). Once again, Plaintiff requested to see the doctor on his next visit to TPCJC as well as a physical therapist and a bone specialist or a neurosurgeon. (*Id.*). Two similar grievances dated August 25, 2015 which were designated as third-step grievances are also attached to Plaintiff's complaint, one of which contains a response by a TPCJC official. (*Id.* at pp. 13, 15). In the first one, Plaintiff asked that he be moved to the medical dorm and assigned a bottom bunk. (*Id.* at p. 15). In the other grievance form,

Plaintiff explained that although the medication that he was taking was "working a little," he was still experiencing pain and thus wanted to see an independent neck specialist. (*Id.* at p. 13). Colonel Mike Solet responded to this grievance form on the day that it was written, advising Plaintiff that he concurred with undescribed findings previously made by Major Triche which do not appear in the record. (*Id.*). After receiving Major Solet's response, on August 29, 2015, Plaintiff completed the final grievance form that is attached to his complaint, designating it as a step-four grievance. (*Id.* at p. 12). In that form, Plaintiff stated that he was awaiting a decision on his request to see a pain specialist, neurosurgeon, or bone specialist. (*Id.*). A TPCJC captain responded to this grievance on September 3, 2015, advising Plaintiff that there was no such thing as a step four; that his first, second, and third-step grievances had been answered; and, that he had previously been sent back to the emergency room in addition to follow-up appointments being scheduled to address his ongoing complaints. (*Id.*).

In addition to the foregoing documentation that Plaintiff attached to his complaint, also before the Court, pursuant to its order of October 27, 2015 (rec. doc. 8), are Plaintiff's sealed medical records that were generated during his multiple stays at TPCJC in recent years. (*See* rec. doc. 16). A review of those records reveals a long history of musculoskeletal complaints affecting various areas of Plaintiff's body. For example, upon his processing into TPCJC in early February 2009, Plaintiff reported arthritis in both hips. He was apparently released on an unknown date but was rearrested on November 29, 2012, with his intake medical screening of that date reflecting a history of hip surgery and neck surgery in 2011. Plaintiff was released yet again but was rearrested on April 26, 2013. The processing records from that date were positive for back and neck problems for which Plaintiff reported taking

six different medications.  Additional medical screening documents were significant for a hip replacement in 2010 and muscle damage in the neck for which Plaintiff had been treated with muscle relaxers and Lortab three times per day.

The medical records also contain the results of MRI testing that was conducted at the Thibodaux Regional Medical Center ("TRMC") on January 23, 2013.  That testing revealed a previous anterior fusion at C5-6 with a minimal to mild broad-based osteophytic spur; a moderately severe broad-based disc bulge versus protrusion at C6-7 causing moderately severe mass effect upon the anterior subarachnoid space and both neural foramina; and moderate disc bulges at C3-4 and C4-5.  The MRI of the lumbar spine demonstrated an annular tear of the L5-S1 disc with a mild central disc bulge causing minimal mass effect upon the central thecal sac; no adenitis at the L3-4 or L4-5 levels; and a previous right hip arthroplasty.  Plaintiff was subsequently seen by Dr. John Davis of the Tulane Spine Center on March 25, 2013 for complaints of back pain, numbness in the arms, and neck pain when standing for long periods of time.  Dr. Davis noted a long history of neck pain and status post cervical fusion with daily neck pain, some days worse than others; bilateral arm pain radiating into the legs; and numbness in the arms and thighs.  The assessment was cervical degenerative disc disease, lumber spinal stenosis, and degeneration of a lumber intervertebral disc.  Further testing was recommended, including a myelogram/CT scan and EMG/nerve conduction studies.  Plaintiff was noted to be wearing a soft neck collar at the time of his processing into TPCJC on April 26, 2013, advising jail personnel that he had been scheduled for further testing in three days as a predicate to additional surgery.  The day following this readmission, Plaintiff completed a "REQUEST FOR MEDICAL ATTENTION FORM," complaining of back pain, numbness in the arms, and neck pain.  Naproxen was

prescribed.  Although Plaintiff was reassessed by Dr. Haydel at TPCJC on April 30, 2013 and was prescribed Londic, Flexeril, and Neurontin, by May 3, 2013, he was requesting to see the nurse again for back and neck pain and his hip replacement, threatening that "[i]f I can't get my Lortab's 500 mg. I am going to get my law[y]er on it."  This threat of litigation was repeated on May 15, 2013.  Up until the date of his release on July 23, 2013, Plaintiff completed numerous other forms requesting medical care, most of them dealing with neck and back pain.

Plaintiff was subsequently rearrested on March 19, 2014.  Processing documents from that re-admission noted neck, back, and right hip surgeries and a work-related injury in October of 2013.  It appears that this stint of incarceration was rather brief, as the records before the Court document Plaintiff's rearrest on June 7, 2014.  During initial screening, Plaintiff reported hip surgery two months earlier and medications that included Lortab and Hydrocodone and possibly an unidentified hypertension drug, identifying Peoples Drug Store as his pharmacy.  Upon contacting that establishment two days later, TPCJC officials learned that Plaintiff had not had his medications filled there since January of 2014 and that he had not had any prescriptions for hypertension medication filled there at all.  By June 25, 2014, Plaintiff was requesting treatment for neck and back pain, complaining two days later that the medication that he had been provided was not effective.  When he was re-evaluated on July 4, 2014, Plaintiff was observed to be "bending at [the] hatch hole" without difficulty.  Due to his chronic complaints of pain, Plaintiff was denied "trusty status" on July 9, 2014.  Other medical records that were generated during this stay at TPCJC include treatment for non-cardiac chest pain, a sore throat, and earwax removal in addition to that for his

continued, repeated complaints, of neck and back pain.  Despite these ongoing complaints, Plaintiff was observed to ambulate and to bend without difficulty on September 28, 2014.

The date on which Plaintiff was released from TPCJC again in relation to his re-arrest and return to jail on June 30, 2015 is not reflected by the records that have been provided to the Court.  What is documented is that neck and lower back pain were noted on his readmission to the facility and by no later than July 5, 2015, he was requesting additional treatment for such discomfort, initially being advised to use over-the-counter medications. On July 7, 2015, Plaintiff made a formal request to see the doctor for his pain and to be moved to the medical dorm.  Plaintiff was promptly seen by medical personnel later that day and was placed on Ibuprofen 600 mg. twice per day until he could be seen by the doctor.  By the next day, the plan was to allow Plaintiff to complete his course of Ibuprofen and to re-evaluate him if there was no relief.

On July 10, 2015, Plaintiff completed another form requesting to see the doctor for his neck and back pain lest he "… write a grievance on ya'll."  Plaintiff was seen by jail medical personnel during the evening medications "pass out" who noted that he had been non-compliant with his morning medication regimen, a requirement that he had to comply with before another appointment with the doctor could be scheduled.  Plaintiff completed another "REQUEST FOR MEDICAL ATTENTION FORM" on July 15, 2015, the copy of which is of poor readable quality.  He was seen again by medical personnel later that evening for complaints of back and hip pain and it was again documented that Plaintiff was non-compliant with his morning medication regimen, thus diminishing the medication's effectiveness.  This would be the last time that Plaintiff would be seen by TPCJC medical personnel prior to his fall on July 20, 2015.

The records that have been provided to the Court include essentially an eyewitness account of the July 20, 2015 occurrence.  After entering the D-Pod at 7:27 a.m. to pass out morning medications, a prison medical official observed Plaintiff holding on to some sort of railing or support bar with one hand, fall onto a table, and then roll off the table and onto the floor where he was found lying in a supine position.  Plaintiff's vital signs were taken and he complained of numbness to both arms and an inability to move his right leg.  An ambulance was summoned and arrived approximately 15 minutes later to transport him to LCMC.  Once there, various testing was performed including a CT scan of the head which was normal.  Similar studies of the cervical spine revealed no acute fracture or misalignment, changes of an anterior interbody fusion at C5-6 with left ucinate hypertrophy and foraminal narrowing, and fairly pronounced degenerative changes at C6-7 and, to a lesser degree, at C4-5.  A CT scan of the chest demonstrated mild subpleural atelectasis in the posterior aspects of the lungs bilaterally.  Studies of the abdomen/pelvis revealed post-operative changes of a right hip replacement, findings consistent with avascular necrosis in the left femoral head, and a small cyst in the left kidney.  The diagnosis was acute cervical strain, degenerative disc disease to the neck following a previous fusion, and an arm contusion.  Plaintiff was treated with Ondansetron and Morphine at the hospital and was prescribed Ibuprofen for pain relief, to follow up with the prison doctor in one week.

The day following the incident, in addition to completing the inmate grievance form that was described earlier, Plaintiff also completed a form requesting additional medical attention.  He was seen by a TPCJC EMT during the evening medication pass out who advised him to continue with the medication that had been recommended at LCMC as well as warm showers and stretching exercises to help ease his expected discomfort.  Plaintiff completed

another medical request form the following day, July 22, 215, and was seen by another EMT who instructed him to take his medication as prescribed.  Yet another medical request form was submitted by Plaintiff on July 24, 2015 in which he asked to see the doctor as he was still in pain.  Plaintiff was seen by an EMT later that day who reminded him that the workup that he had received at LCMC revealed no significant injuries from his fall and that he should take his medication as directed.  In response to various forms that Plaintiff completed on July 26, 2015, an EMT observed Plaintiff to have full mobility of all extremities and noted that he was then scheduled to be re-evaluated by the doctor on August 18, 2015.  Plaintiff was seen by the TPCJC doctor on July 28, 2015 whose treatment note from that date is unfortunately not a model of legibility.  Ibuprofen and Flexeril were prescribed.

On August 1, 2015, Plaintiff completed another "REQUEST FOR MEDICAL ATTENTION FORM," inquiring to what extent he would have to pay for his medications and medical care.  An EMT promptly responded to Plaintiff's inquiry the same day.  The inmate request form described earlier was completed by Plaintiff on August 3, 2015 in which he again complained to the effectiveness of Ibuprofen and requested to be seen by a bone specialist or a neurosurgeon.  That form was responded to on August 4, 2015, reminding Plaintiff of the full workup he had received at LCMC following his fall.

In the weeks that followed, Plaintiff completed no less than 18 separate forms requesting medical treatment as well as grievance and inmate request forms, doing so at times on an almost daily basis.  Noteworthy among those as a form that Plaintiff completed on August 15, 2015 in which he acknowledged that Flexeril provided some relief and his desire to receive something other than Ibuprofen for pain.  Plaintiff was observed to bend and move normally on this occasion.  Plaintiff was re-evaluated by the jail physician on

August 18, 2015 who reviewed the CT scan results, rendered a diagnosis of cervical strain, and prescribed Ibuprofen, Neurontin, and neck exercises.  Plaintiff was wearing a cervical collar at this time.  In light of his ongoing complaints, on August 31, 2015, Plaintiff was referred to LCMC for further evaluation where he was seen on September 2, 2015 and was provided Hydrocodone/Acetaminophen.  The diagnosis was cervical radiculopathy and cervicalgia, likely chronic.  Plaintiff was referred to the Neurology Department and was provided a substitute collar and it was noted that he was already receiving "appropriate" medications.  Subsequent records from September 13, 2015 reflect that Plaintiff was not doing the recommended neck exercises at the time because he had not been furnished an extra blanket which he could fashion into a pillow.

Throughout this time, Plaintiff was also evaluated for hypertension and was treated with Clonidine and Lisinopril.  Additional forms that he completed reflect his dissatisfaction with the treatment that had been provided and his impatience with the scheduling of further testing and evaluation, issues which affect prisoners and non-prisoners alike.  By the end of September 2015, an appointment had been secured with the Neurology Department of the University Medical Center ("UMC") in New Orleans.  In a form that he completed on October 2, 2015, Plaintiff "demanded" to know the date of his impending appointment under threat of litigation.  That request was promptly responded to but the precise date of his appointment was withheld for obvious security reasons.

Plaintiff was seen at the UMC Neurology Department on October 5, 2015 and an MRI was ordered with a follow-up evaluation to go forward four weeks post-imaging.  Through various forms that he completed on October 6, 7, 10, 11, 12, and 15, 2015, Plaintiff expressed dissatisfaction with the presence of transporting deputies when the results of the MRI were

to be given to him and by October 15, 2015, he suggested that the MRI be conducted on an emergency basis. Plaintiff continued to receive the medications that had been recommended by the physicians who had seen him. In an October 25, 2015 form requesting additional medical attention, Plaintiff continued to complain neck and hip pain but was observed waving at other inmates, generally joking around, and ascending stairs without difficulty.

On November 3, 2015, Plaintiff was transported to the Medical Center of Louisiana at New Orleans ("MCLNO") where an MRI was performed. That testing revealed a remote cervical fusion at C5-6; a small central disc protrusion at C3-4 with mild stenosis of the spinal canal and mild compression of the spinal cord; and, osteophyte/disc complexes at C4-5 and C6-7 causing irregularity of the spinal canal without significant stenosis. Plaintiff was subsequently seen by the TPCJC physician on November 11, 2015 who advised him of the MRI results. Plaintiff continued to complain of neck pain and was observed to be wearing a cervical collar and to be agitated. The assessment was cervicalgia, cervical disc disease, and a history of a previous fusion. He was continued on Ibuprofen, the dosage of Neurontin was increased, and further follow-up with the Neurology Department was to be scheduled. Based on a review of the records that have been provided to the Court, on every occasion that he requested medical attention Plaintiff was promptly seen by TPCJC medical officials that same day. Plaintiff recently notified the Court that he had been transferred from TPCJC to the Lafourche Parish Detention Center. (Rec. doc. 14).

It is against the backdrop of the above-described medical and prison records, records upon which the Court may properly rely, *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 24 (5th Cir. 2006), that the sufficiency of the allegations presented by Plaintiff against the named Defendants be analyzed. Plaintiff's initial allegation regarding the existence of overcrowding

at TPCJC, in and of itself, does not establish a constitutional violation. *Rue v. Gusman*, No. 09-CV-6480, 2010 WL 1930936 at *5 (E.D. La. May 11, 2010)(and cases cited therein). Turning to the incident that occurred at that facility on July 20, 2015, and putting aside the possibility that Plaintiff himself was guilty of some degree of comparative fault, to the extent that Plaintiff's complaint can be read as alleging that he suffered a fall due to insufficient or inadequate railings, he presents only allegations of negligence which are not actionable under §1983. *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1989)(quoting *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 664 (1986)). In terms of Plaintiff's housing assignment, case law counsels that such decisions be deferred to prison officials in the first instance. *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008).

Turning to the primary claim that Davis urges in this matter, in order to establish a constitutional violation, he must demonstrate that the Defendants were deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain.[1/] *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifferences is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997). "To show subjective deliberate indifference, a plaintiff must present evidence: (1) that each defendant had subjective knowledge of 'facts from which an inference of substantial risk of serious harm could be drawn,' (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that ... [they] 'subjectively intended that harm occur.'" *Tamez*

---

[1/] Regardless whether Plaintiff was a pre-trial detainee or a convicted prisoner, the standard governing the provision of medical care to him is the same. *Hale v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

*v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009)(quoting *Thompson v. Upshur County, Texas*, 245 F.3d 447, 458-59 (5th Cir. 2001)).  Such a showing requires a plaintiff to establish that prison "officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)(quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).  In an "episodic act or omission" case like this one, to hold superiors like the Defendants liable, the Plaintiff must show not only that the officials acted with subjective deliberate indifference but that "... the employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights." *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997)(en banc)(quoting *Hare v. City of Corinth*, 74 F.3d 633, 649 n. 4 (5th Cir. 1996)).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). The decision of whether to provide additional treatment to an inmate is a classic example of a matter of medical judgment. *Domino*, 239 F.3d at 756.  If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain persists despite the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010).  That an inmate's medical care "... may not have been the best money could by" is insufficient to establish a

16

constitutional violation, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992), and the failure to provide a specialist in the field of the inmate's choosing does not, in and of itself, state a claim of deliberate indifference. *Green v. McKaskle*, 788 F.2d 1116, 1127 (5th Cir. 1986). And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also establish that he suffered substantial harm as a result of the delay. *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010). "Experiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's ... medical records demonstrate that he received treatment." *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759549 at *4 (W.D. Tex. Feb. 23, 2011)(quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.

As respects the three specifically named Defendants, the medical and other prison records that are presently before the Court fall far short of establishing the objective and subjective components needed to prevail on a claim of deliberate indifference. In fact, other than the occasional mention of the Sheriff, Warden, and/or Parish President in various grievance and inmate request forms that Plaintiff completed, no specific facts are alleged showing that any of them had any direct involvement in the provision of medical care to him. None of the forms that bear a response from prison officials were specifically authored by any of the named Defendants and Davis does not allege that the Defendants were even aware that he had completed and submitted those forms. Following the incident of July 20, 2015, Plaintiff readily admits that he was tended to by medical personnel and was transported to the hospital where testing was done and treatment was administered. Once he was returned to TPCJC, Plaintiff's repeated, almost daily complaints and concerns about his medical care were promptly addressed by jail medical officials. To the extent that there were any lapses

17

in the provision of medical care to Plaintiff, there is no evidence that those lapses were caused or even known by the Defendants.  As was aptly noted by the Fifth Circuit, "[c]ontinuing back pain is unpleasant.  Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred." *Mayweather*, 958 F.2d at 91.  In short, the determinative issue here is not whether the medical care that Plaintiff received was substandard in some respect, whether his medical problems or pain persisted despite the treatment, or whether he was dissatisfied with his care; rather, it is only whether his serious medical needs were met with deliberate indifference by the named Defendants.  Based upon a review of the record that is presently before it, the Court easily answers that question in the negative.

## RECOMMENDATION

For the foregoing reasons, it is recommended that Plaintiff's suit be dismissed with prejudice pursuant to 28 U.S.C. §1915(e)(2)(B)(i) and (ii).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc). [2]

---

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.

New Orleans, Louisiana, this __2nd__ day of _____December_____, 2015.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE